FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 24, 2017

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THOMAS TABBERT, | No.   2:15-CV-00039-SMJ |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| HOWMEDICA OSTEONICS CORP., | |
| Defendant. | |

Before the Court is Plaintiff Thomas Tabbert's Third Renewed Motion for Summary & Declaratory Judgment, ECF No. 191. Mr. Tabbert moves for summary judgment on his claim for declaratory judgment that his 1995 non-compete agreement with Howmedica is invalid and unenforceable. He also moves for summary judgment on Howmedica's breach of contract claim and on his affirmative defense of estoppel.

The Court held a hearing on the motion on October 17, 2017. Upon consideration of the briefing and the arguments presented at the hearing, the Court denied Mr. Tabbert's motion for summary judgment on all grounds. This order memorializes and supplements the Court's oral ruling.

ORDER - 1

# BACKGROUND

**A.    Undisputed Facts**

### 1.    Mr. Tabbert worked as a sales representative for Howmedica from 1993 to June of 2014.

In 1993, Mr. Tabbert began working as a sales representative for a medical supply distribution company known as Stryker. Initially, Mr. Tabbert sold bone-saws and other surgical tools in a territory in Wisconsin. In 1995, he applied for a position as a sales representative with the company now known as Howmedica Osteonics Corp. (Howmedica), a Stryker subsidiary corporation. Mr. Tabbert's transfer to Howmedica was effective January 1, 1996.

As part of his new position, Mr. Tabbert moved to the Eastern Washington/North Idaho region. He began selling hip and knee implants. He also provided technical assistance during surgeries to advise physicians and explain design aspects of implants.

### a.    Non-compete Agreements

Mr. Tabbert signed a non-compete agreement when he first began his employment with Stryker in 1993. Howmedica has a copy of this agreement in Mr. Tabbert's personnel file.

When Mr. Tabbert transferred to the new position with Howmedica, Stryker required Mr. Tabbert to sign a new non-compete. This non-compete (the 1995 Agreement) was signed on December 12, 1995. Under the 1995 Agreement, Mr.

Tabbert would be prohibited from either competing against Stryker or soliciting its customers for the sale of orthopedic products in the territory in which he worked for a period of one year following the termination of his employment. The agreement contained a choice of law clause designating New Jersey as the governing state.

The 1995 Agreement is an "unpaid non-compete" meaning that Stryker was not required to provide compensation for the one-year non-compete period. The 1995 Agreement states that it was supported by consideration, but does not specify what this consideration is. Howmedica has a copy of the executed agreement in Mr. Tabbert's personnel file.

### 2. Mr. Tabbert resigned from Howmedica, and Stryker indicated it would enforce the 1995 agreement.

On May 29, 2014, Mr. Tabbert informed his supervisor, Duane Riggs, that he was resigning from his position at Stryker effective June 10, 2014. That same day, Jenny Lavey, Howmedica's HR Client Services Manager, sent Mr. Riggs an email titled "RE: Tabbert non-compete." ECF No. 36-3 at 8. The email states "FYI—it's pretty old, guessing it's a paid one!" *Id.* Attached to the email was a copy of the 1995 non-compete agreement. Mr. Riggs responded, "It's a paid non-compete, but I will not enforce it. Please do not let him know that until we absolutely have to. His resignation day is June 10, so I am assuming we do not have to let him

*know until July 10!" Id.* Ms. Lavey sent this email only to Mr. Riggs. Mr. Tabbert did not receive a copy of this communication.

In July of 2014, Mr. Tabbert contacted Ms. Lavey and asked whether Stryker would hold Mr. Tabbert to a non-compete agreement. Mr. Tabbert recalls that Ms. Lavey informed him that the non-compete was "non-compensatory." On July 16, 2014, Mr. Tabbert sent an email to his attorney stating that he had learned "through word of mouth" that Stryker intended to enforce the 1995 Agreement. ECF No. 298-2 at 92. After Mr. Tabbert left Howmedica, Stryker did not compensate Mr. Tabbert.

### 3.     In June of 2014, Mr. Tabbert began working for Rocky Mountain Medical Distributors.

After he resigned from Howmedica, Mr. Tabbert began working for Rocky Mountain Medical Distributors, LLC (RMMD). RMMD is a medical supply distribution company. RMMD had a distribution agreement with MicroPort Orthopedics, Inc. (MicroPort). Microport designs, manufactures, and distributes medical devices, including orthopedic hip and knee implants. MicroPort competes directly with Howmedica.

Mr. Tabbert joined RMMD as the Regional Vice President of Sales. ECF No. 298-8. His sales territory included North Idaho, Washington, Oregon, Alaska and Hawaii. His sales territory in North Idaho and Washington overlapped with his territory as a sales representative for Howmedica.

**4.    In the twelve months following his resignation from Howmedica, Mr. Tabbert contacted surgeons with whom he worked as a Howmedica sales representative.**

*a.    Dr. Craig Bone*

Mr. Tabbert communicated with Dr. Bone, one of his former surgeons. Mr. Tabbert informed Dr. Bone when he sent his letter of resignation. In the twelve months following his resignation from Howmedica, Mr. Tabbert met with Dr. Bone three or four times. Mr. Tabbert characterized the meetings as "[s]ocial, to say hello." ECF No. 298-3 at 44. In the year after Mr. Tabbert resigned from Howmedica, Howmedica's sales to Dr. Bone declined ninety-six percent. In October of 2016, Dr. Bone submitted a letter indicating that he did not discontinue his business with Howmedica because of Mr. Tabbert's actions. He also submitted a declaration to the same effect. ECF 191-2 at 38 (dated June 21, 2017).

*b.    Dr. Patrick Dawson*

Mr. Tabbert communicated with Dr. Dawson in person and via text message. On May 9, 2014, Mr. Tabbert sent a text message to Dr. Dawson that said, "Received a termination threat e-mail this morning. Call me when you can." Mr. Tabbert also met with Dr. Dawson in Las Vegas, Nevada on or about March 25, 2015. Howmedica's sales to Dr. Dawson declined ninety-nine percent in the year following Mr. Tabbert's resignation. Dr. Dawson submitted a declaration denying that Mr. Tabbert solicited his business or that Howmedica's sales decline was attributable to Mr. Tabbert. ECF No. 191 at 41 (dated June 26, 2017).

### c. Dr. Mark Merrell

Mr. Tabbert acknowledged that he communicated with Dr. Merrell. Howmedica's sales to Dr. Merrell declined twenty percent in the year following Mr. Tabbert's resignation. Dr. Merrell did not submit a declaration.

### d. Dr. John Staheli

Mr. Tabbert communicated with Dr. Staheli. When asked if he solicited or attempted to solicit Dr. Staheli, Mr. Tabbert responded, "gray area." Mr. Tabbert spoke with Dr. Staheli on behalf of Microport. On one occasion, Mr. Tabbert sent a text message to Dr. Staheli that said, "John, Rocky will call you today for dinner arrangements this evening if it's still good. We will coordinate through Rocky, and I will not be there." Howmedica's sales to Dr. Staheli declined one percent in the year following Mr. Tabbert's resignation. Dr. Staheli submitted a declaration denying that Mr. Tabbert solicited his business or that Howmedica's sales decline was attributable to Mr. Tabbert.

### e. David Gibbons

Mr. Tabbert communicated with Dr. Gibbons. Mr. Tabbert had dinner with Dr. Gibbons, his personal assistant, Tim Nicholas, and his new partner, Josh Miller, on or about September 15, 2014. Howmedica's sales to Dr. Gibbons declined forty-one percent in the year following Mr. Tabbert's resignation. Dr. Gibbons submitted a declaration denying that Mr. Tabbert solicited his business or that Howmedica's sales decline was attributable to Mr. Tabbert.

*f.*   *James Hazel*

Mr. Tabbert communicated with Dr. Hazel. Mr. Tabbert had a conversation with Dr. Hazel regarding Microport products. ECF No. 298-1 at 70. Howmedica's sales to Dr. Hazel declined forty-five percent in the year following Mr. Tabbert's resignation. Dr. Hazel did not submit a declaration.

**5.    Mr. Tabbert sued Howmedica for religious discrimination, and Howmedica countersued for breach of contract.**

On February 9, 2015, Mr. Tabbert filed this lawsuit. On April 10, 2015, Howmedica answered Mr. Tabbert's suit and counter-sued Mr. Tabbert for breaching the restrictive covenant components of the 1995 Agreement. Mr. Tabbert answered, raising the affirmative defense that the 1995 Agreement is inoperable because a separate 2003 non-compete agreement constituted a novation and superseded the 1995 Agreement.

The parties conducted numerous depositions including depositions of Mr. Tabbert, Mr. Behrens, Mr. Riggs and Ms. Lavey. Mr. Behrens is a former branch manager at Howmedica and supervised Mr. Tabbert during his tenure as a Howmedica sales representative. He is now the regional vice president of MicroPort. Ms. Lavey is Howmedica's HR Client Services Manager. She was deposed under Rule 30(b)(6) as Howmedica's corporate representative. Mr. Riggs is a general manager at Stryker.

## B.    Disputed Facts

### 1.    2003 Agreement

Mr. Tabbert alleges that during the time he worked for Howmedica, he was asked to sign a third non-compete agreement in 2003 (the 2003 Agreement). However, Mr. Tabbert does not possess a signed copy of this non-compete agreement and Howmedica asserts Mr. Tabbert's personnel file contains only the 1993 and 1995 non-compete agreements.

In support of his assertion that he signed an agreement in 2003, Mr. Tabbert points to the testimony of Rob Behrens. Rob Behrens served as the Northwest Branch Manager in 2003 and oversaw the Northwest sales representatives, including Mr. Tabbert. Mr. Behrens submitted a declaration in which he stated that he was instructed by Stryker in 2003 to ensure that all sales representatives had completed a "current" non-compete agreement. Mr. Behrens is now the Regional Vice President at MicroPort and, until recently, a third-party defendant in this case.

The alleged 2003 Agreement was paid, meaning Stryker would make severance payments for employees if the company decided to enforce the non-compete agreement. Mr. Behrens stated that he was instructed to conduct an audit to ensure that all sales representatives he managed had signed a paid non-compete similar to the 2003 Agreement. He testified that he was positive that all sales

representatives had signed a new, paid non-compete because if they had not it would have been his policy to dismiss them.

During a deposition conducted by Howmedica's attorneys, Mr. Behrens testified that he did not recall how he received the 2003 non-competes or who asked him to conduct the audits. ECF No. 298-2 at 23. Mr. Behrens testified that he did not personally audit Mr. Tabbert's file, but that he based his opinion on the representation of one of his assistants. *Id.* He also stated that he had a conversation with Mr. Tabbert after his employment ended in which Mr. Tabbert represented to him that he believed he was bound by the 1995 Agreement. *Id.* at 27.

Mr. Tabbert also relies on the testimony of Ms. Rebecca Holmes, who worked as a Human Resources Manager for Stryker from 2008 to 2012. She provided HR support to Stryker's Northwest branch. ECF No. 298-2 at 73. Ms. Holmes conducted an audit to ensure that all employees had paid non-competes. *Id.* She testified that she identified employees who did not have paid non-competes and required those employees to sign paid non-compete agreements until the company was 100 percent compliant. *Id.* However, Ms. Holmes did not testify that Mr. Tabbert's non-compete was reviewed as part of the audit she conducted and she did not testify that Stryker was, in fact, 100 percent compliant. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id*. at 322. "When the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986) (internal citation omitted). When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

# DISCUSSION

Mr. Tabbert moves for summary judgment on three claims. First, he moves for summary judgment on his claim for declaratory judgment that the 1995 Agreement between Mr. Tabbert and Stryker is unenforceable in this dispute. Second, he seeks summary judgment on Howmedica's breach of contract claim. Third, he seeks summary judgment on his claim that Howmedica should be estopped from enforcing any non-compete agreement against him. Howmedica has shown that genuine issues exist on all claims. Accordingly, summary judgment is not proper.

**A.    Genuine issues of fact preclude summary judgment on Mr. Tabbert's declaratory judgment claim.**

Mr. Tabbert first moves for summary judgment on his claim for declaratory judgment that "the 1995 Agreement is unenforceable and inoperative." ECF No. 191 at 5. He frames the issue as follows: "[W]hether (as Defendant claims) Mr. Tabbert is subject to the 1995 Agreement or whether Mr. Tabbert is (as Mr. Tabbert claims and the evidence shows) subject to the 2003 Agreement." *Id.* Thus, as presented to the Court, Mr. Tabbert's motion involves two questions: (1) whether the 1995 Agreement is valid and enforceable and (2) whether the 1995 Agreement was superseded by a 2003 novation.

Although styled as a "motion for declaratory judgment," Mr. Tabbert's declaratory judgment claim comes before the Court on a motion for summary

judgment. Accordingly, Mr. Tabbert is entitled to judgment on his declaratory judgment claim only if he can show that there is no genuine issue of material fact, and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Mr. Tabbert's claim fails on both counts. First, Mr. Tabbert cannot show that he is entitled to judgment as a matter of law on his contention that the contract fails for want of consideration because continued employment is adequate consideration for continued employment under New Jersey law. Second, a genuine issue of material fact precludes the Court from finding in Mr. Tabbert's favor on his novation theory.

### 1. Mr. Tabbert is not entitled to summary judgment on his claim for declaratory judgment regarding the operation of the 1995 Agreement.

Mr. Tabbert's first argument—that the non-compete is unenforceable because it lacks valid consideration—is a proper subject for declaratory judgment.[1] However, Mr. Tabbert is entitled to summary judgment on this claim only if he can show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Mr. Tabbert is therefore not entitled to summary judgment on this theory.

---

[1] Declaratory judgment is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue . . ." *Delno v. Mkt. St. Ry. Co.*, 124 F.2d 965, 968 (9th Cir. 1942). The burden of proof in a declaratory judgment action "is generally upon the party who will be defeated if no evidence relating to the issue is given on either side." *Pac. Portland Cement Co. v. Food Mach. & Chem. Corp.*, 178 F.2d 541, 547 (9th Cir. 1949).

## 2. The 1995 Agreement is enforceable under New Jersey law.

Mr. Tabbert argues that the 1995 Agreement is void because it lacks independent consideration, which is required to support a non-compete agreement under Washington law. Howmedica asserts that the 1995 Agreement is enforceable under the laws of New Jersey, which govern pursuant to a choice of law clause included in the non-compete agreement. Thus, before the Court can assess the enforceability of the non-compete agreement, it must first determine whether the 1995 Agreement contains a valid choice of law clause.

### a. *The 1995 Agreement contains a valid choice of law clause.*

In a diversity case, a federal court must apply the conflict of law rules of the forum state. *See Santana v. Holiday Inns, Inc.*, 686 F.2d 736, 737 (9th Cir. 1982) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Accordingly, the Court applies Washington's choice of law rules. Washington courts follow the Restatement (Second) of Conflict of Laws. *See Seizer v. Sessions*, 940 P.2d 261, 264 (Wash. 1997). Under this analysis, the Court must first determine whether the laws of the designated state conflict with Washington law. *Id.* If there is an actual conflict, the Court will then determine which law to apply. *Id.*

There is an actual conflict between the laws of Washington and New Jersey regarding the type of consideration sufficient to support a non-compete agreement. In Washington, a covenant not to compete entered into after employment

commences requires independent consideration. *See, e.g.*, *Salewski v. Pilchuck Veterinary Hosp., Inc.*, 359 P.3d 884 (Wash. Ct. App. 2015) (affirming the trial court's finding that mutual promises of shareholder-employees of professional veterinary services corporation not to compete with corporation were adequate consideration for non-compete agreement). Continued employment alone is insufficient to support the covenant. *Id.* On the other hand, New Jersey law permits continued employment as consideration for a non-compete agreement. *See Martindale v. Sandvik, Inc.,* 800 A.2d 872, 879 (N.J. 2002).

Because an actual conflict exists, the Court must next determine which state's law to apply. Courts will disregard a choice of law provision and apply Washington law only if (1) without the provision, Washington law would apply; (2) the chosen state's law violates a fundamental public policy of Washington; and (3) Washington's interest in the determination of the issue materially outweighs the chosen state's interest. *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1121–22 (Wash. 2007).

The first and third inquiries support disregarding the choice of law clause and applying Washington law. Washington courts follow the "most significant relationship test" when determining which law would apply in the absence of a choice of law clause. *Seizer*, 940 P.2d at 265. This test considers, among other things, the states in which the parties are domiciled, the place in which the contract

was negotiated, the state where the contract was intended to be performed, and the state where the alleged breach occurred. *Id.* Howmedica's New Jersey domicile aside, all other aspects of the contract relate directly to Washington State. Mr. Tabbert signed the contract in Washington, he worked as a representative in Eastern Washington during his tenure with Howmedica, and the alleged breach of the non-compete occurred in Washington. Accordingly, Washington has the most significant relationship to the contract and Washington law would apply in the absence of the choice of law clause. Washington likewise has a material interest in protecting the interests and expectations of its citizens that outweighs New Jersey's interest in protecting its corporations that choose to avail themselves to the laws of foreign states.

The second inquiry—whether enforcing the other state's law would violate the forum state's fundamental public policy—presents a more difficult analysis. On the one hand, both Washington and New Jersey allow the enforcement of non-competes. This suggests that non-compete agreements in general do not violate Washington's public policy. On the other, one could read the Washington courts' opinions requiring additional consideration as reflective of a policy protecting workers from being strong-armed into signing restrictive covenants. *See Labriola v. Pollard Group, Inc.*, 100 P.3d 791, 794–95 (Wash. 2004). However, the courts appear to frame the issue in terms of contract principles of what can and cannot

constitute consideration rather than principles of public policy. *See id.; McKasson v. Johnson*, 315 P.3d 1138 (Wash. Ct. App. 2013). Absent a clear statement of policy from the courts or the legislature, the Court will not interfere with the parties' choice of law clause.

Because only two of the three elements are met, the Court will enforce the New Jersey choice of law clause. Accordingly, New Jersey law governs all aspects of the non-compete. For our purposes, this means that the non-compete agreement may be valid even if it lacked consideration independent of continued employment.

   b.   *Continued employment is valid consideration to support a non-compete under New Jersey law.*

Having determined the choice of law clause is valid, the Court must next examine Mr. Tabbert's claim under New Jersey law. Mr. Tabbert argues that the agreement is invalid because it was not supported by consideration independent of continued employment. While this would be a valid argument under Washington law, New Jersey courts have adopted a different approach. *Martindale v. Sandvik, Inc.,* 800 A.2d 872, 879 (N.J. 2002) ("[I]n New Jersey, continued employment has been found to constitute sufficient consideration to support certain employment-related agreements."). The 1995 Agreement may therefore be enforceable regardless of whether Howmedica provided additional consideration. However, Howmedica also asserts that Mr. Tabbert received additional consideration to support the non-compete.

Because the non-compete agreement may be enforceable under New Jersey law, the Court cannot declare the agreement unenforceable on these facts. Accordingly, Mr. Tabbert is not entitled to judgment on these grounds.

### 3. Genuine issues of material fact preclude summary judgment on Mr. Tabbert's novation defense.

Mr. Tabbert next asserts that declaratory judgment is proper because the 1995 Agreement is inoperative. He asserts that the agreement was "replaced" by the 2003 Agreement. ECF No. 21 at 9. To establish a novation, Mr. Tabbert must show: (1) a previously valid contract; (2) an agreement to make a new contract; (3) a valid new contract; and (4) an intent to extinguish the old contract. *Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Taxation*, 999 A.2d 489, 497 (N.J. App. Div. 2010). Howmedica disputes elements two, three, and four. Specifically, Howmedica contends that it never entered into a 2003 non-compete agreement with Mr. Tabbert. Mr. Tabbert cannot produce an executed copy of the 2003 agreement, and Howmedica asserts that one does not exist. Because a genuine issue of fact exists as to whether the parties entered a new agreement, Mr. Tabbert is not entitled to summary judgment on this issue.

As an initial matter, the Court must establish which party bears the burden regarding the operation of the 2003 non-compete agreement. Mr. Tabbert asserts that Howmedica "bears the burden of proving that the 2003 Agreement does not apply to Tabbert given the choice Stryker made to sue Tabbert, RRMD and

Microport because of Tabbert's alleged violation of the 1995 Agreement." ECF No. 191 at 10. Mr. Tabbert is incorrect. The party raising an affirmative defense bears the burden of proof on the issues necessary to establish the defense. *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988). Howmedica brings its breach of contract claim under the 1995 Agreement, and Mr. Tabbert raises the 2003 novation as an affirmative defense. ECF No. 21 at 9. Accordingly, Mr. Tabbert has the burden to prove that the 2003 Agreement constitutes a novation that supersedes 1995 Agreement.

The parties sharply dispute whether a 2003 agreement occurred at all. Mr. Tabbert alleges that he has a vague recollection of signing such an agreement and has produced an unsigned copy of the agreement that he states he kept for his records. ECF No. 298-1 at 67. He has also produced the declaration of Rob Berhens, who served as the Regional Director for Howmedica's North West branch in 2003. ECF No. 94-2 at 30. Mr. Behrens testified that Howmedica instructed him to conduct an audit to ensure that all sales representatives under his supervision had a 2003 non-compete agreement on file. *Id.* He also stated that if a sales representative had refused to sign the new non-compete, it would have been his practice to fire that employee. *Id.* at 32.

For its part, Howmedica has produced evidence that Mr. Tabbert's file does not contain a 2003 non-compete agreement. ECF No. 298-1 at 125. Ms. Lavey

testified that Howmedica has no evidence that the Northwest Branch conducted an audit of the non-compete agreements in 2003. ECF No. 298-2 at 3. Howmedica also counters Mr. Behrens' declaration with testimony taken from his deposition. Specifically, when he was questioned about the statements he made in his declaration, Mr. Behrens stated that he did not personally verify Mr. Tabbert's file and that he could not recall having a conversation with Mr. Tabbert about the 2003 Agreement. ECF No. 298-2 at 23. Howmedica's actions following Mr. Tabbert's resignation could also be consistent with the absence of a 2003 non-compete agreement. On the day that Mr. Tabbert announced his resignation from Howmedica, Ms. Lavey emailed Mr. Tabbert's supervisor, Duane Riggs, regarding Mr. Tabbert's non-compete. ECF No 298-2 at 82. In the email, Ms. Lavey remarked that the non-compete was old and attached the 1995 non-compete to the email. *Id.*

Because there is a disputed issue of material fact regarding whether the 2003 Agreement occurred, Mr. Tabbert cannot meet his burden for summary judgment on this issue. Accordingly, neither of Mr. Tabbert's theories supporting his declaratory judgment claim are viable on summary judgment.

**B.** **Genuine issues of material fact preclude summary judgment on Howmedica's breach of contract claim.**

Mr. Tabbert also moves for summary judgment on Howmedica's breach of contract claim on the grounds that Howmedica cannot establish that Mr. Tabbert breached the non-compete agreement or that the alleged breach proximately caused

Howmedica's alleged damages. Under *Celotex*, a party who does not bear the burden of proof at trial can meet his burden on summary judgment by showing that the non-moving party will be unable to satisfy an essential element of a claim at trial. *Id.* Here, Howmedica has advanced facts and arguments supporting reasonable inferences in its favor, which—taken together and viewed in the light most favorable to its claim—are sufficient to establish a prima facie case for breach of contract.

1. **Howmedica has evinced facts sufficient to support a reasonable inference that Mr. Tabbert breached his non-compete agreement.**

Under the 1995 Agreement, Mr. Tabbert agreed that he would protect Stryker's confidential information, and, for one year following the termination of his employment relationship with Stryker, he would not compete against Stryker or solicit Stryker's customers for the sale of orthopedic products in the territory in which he worked. ECF No. 298-1 at 93–95. Mr. Tabbert asserts Howmedica cannot show that he breached his non-compete agreement. Specifically, Mr. Tabbert argues that Howmedica is unable to show that he utilized confidential information or that he entered his former sales territory in the year following his resignation. However, Howmedica has produced information sufficient to support a reasonable inference that Mr. Tabbert violated the agreement on both fronts. Accordingly, summary judgment in Mr. Tabbert's favor is not proper.

*a.* *Howmedica has produced facts that support its claim that Mr. Tabbert utilized confidential information.*

Mr. Tabbert first argues that Howmedica cannot show that Mr. Tabbert utilized Stryker's confidential information. Mr. Tabbert cites to the deposition of Ms. Lavey to support his argument. When asked which confidential information Mr. Tabbert utilized, Ms. Lavey responded that she "can't speak to what he utilized." ECF No. 191-2 at 56. She went on to state that she did not know what specific information Mr. Tabbert utilized, but that she believed "there were some text messages and things that were given forward in discovery." *Id.* at 57.

In response, Howmedica points to an email between Mr. Tabbert and Dr. Bone in which Mr. Tabbert shared a PowerPoint presentation belonging to Stryker. Mr. Tabbert wrote that he would "keep looking and send others if [he found] any." ECF No. 298-4 at 2. This email was sent on October 22, 2014, after Mr. Tabbert resigned from Howmedica. *Id.* Howmedica also cites Mr. Tabbert's deposition testimony in which he acknowledges that he learned sales techniques and product information during his tenure at Howmedica. ECF No. 298-1 at 13. Howmedica argues that Mr. Tabbert wrongfully utilized this information to compete with Howmedica after he resigned from the company.

Howmedica has shown that there is a genuine dispute of material fact regarding whether Mr. Tabbert misappropriated confidential information belonging to Stryker or Howmedica. Viewed in the light most favorable to Howmedica, Mr.

Tabbert's email correspondence with Dr. Bone and his admission that he gained knowledge of the orthopedic industry from Howmedica could support Howmedica's claim that Mr. Tabbert improperly utilized its confidential information.

> **b.** *Howmedica has produced facts to support its claim that Mr. Tabbert entered his former sales territory as a representative for RMMD.*

Mr. Tabbert next argues that Howmedica cannot show that Mr. Tabbert breached his agreement by entering the same territory in which he worked during his tenure at Howmedica. Mr. Tabbert represents that Howmedica "does not know the 'territory' that Mr. Tabbert went into in alleged violation of the 1995 agreement." ECF No. 12. However, this statement mischaracterizes the evidence. In one of the 30(b)(6) depositions, Mr. Crotty asked Ms. Lavey what she meant when she said Mr. Tabbert "went into the territory." ECF No. 191-2 at 60. Ms. Lavey replied that Mr. Tabbert had been seen at a hospital and associating with a doctor that was in his territory when he was working with Stryker. *Id.* When asked which hospital and which doctor, Ms. Lavey stated that she could not remember. She indicated that there was an email and a picture of Mr. Tabbert at the hospital, but that she could not cite to it from memory. *Id.* When confronted with the same question in a later deposition, Ms. Lavey again stated that she based her conclusion on an email and a photograph, but that she could not remember the specifics. But a

lapse of memory is not the same as an absence of knowledge. Indeed, when confronted with the email and photograph to which Ms. Lavey referred, Ms. Lavey could confirm it was the evidence supporting her conclusion. ECF No. 191-2 at 69.

In fact, the record contains evidence from which a reasonable juror could infer Mr. Tabbert entered his former sales territory and solicited the surgeons with whom he'd formerly worked as a Howmedica sales representative. Mr. Tabbert's regional assignment with RMMD included North Idaho, Washington, Oregon, Hawaii and Alaska. 298-1 at 16. As a representative at Howmedica, Mr. Tabbert had also been assigned to North Idaho and Eastern Washington. Moreover, Howmedica produced an email from Chris O'Niell, a Stryker sales representative, in which Mr. O'Niell outlined three different occasions where he witnessed Mr. Tabbert meeting with his former Howmedica surgeons. ECF No. 298-6 at 10. Mr. O'Niell also attached a photograph, which he stated depicted Mr. Tabbert in the staff lounge of the operating room at Lourdes Medical Center, one of the hospitals to which Mr. Tabbert was assigned while working at Howmedica. *Id.* at 11.

Viewed in the light most favorable to the non-moving party, the evidence produced by Howmedica is sufficient to create a genuine issue of material fact regarding whether Mr. Tabbert solicited surgeons in his former territory. Accordingly, Howmedica could establish the element of breach in its prima facie

case for breach of contract. For this reason, Mr. Tabbert's motion for summary judgment fails on this point.

### 2. Howmedica has produced sufficient facts to support a reasonable inference that Mr. Tabbert's alleged breach was a cause of Howmedica's alleged lost profits.

Mr. Tabbert argues that, even if Howmedica could show he breached his non-compete agreement, it cannot show that Mr. Tabbert's breach is a proximate cause of its claimed losses. To survive Mr. Tabbert's motion for summary judgment, Howmedica need not establish that it will prevail at trial. Instead, it must only show that there are facts from which a reasonable juror could infer that Mr. Tabbert's breach proximately caused its losses. Howmedica has done so here, and Mr. Tabbert's motion on this issue therefore fails.

In support of its causation argument, Howmedica utilizes calculations taken from a report compiled by its damages expert, Nicholas Knapton. Howmedica points to its sales figures for physicians Mr. Tabbert serviced while employed with Howmedica in the years preceding and following Mr. Tabbert's departure. The sales show an overall 33% decline in the year following Mr. Tabbert's resignation. Howmedica also points to evidence that Mr. Tabbert remained in contact with several of the surgeons he formerly serviced at Howmedica. Mr. Tabbert admits that at least some of his contacts amounted to solicitation, ECF No. 298-3 at 28, or fell within a "gray area," ECF No. 298-1 at 71. Taken together, Howmedica argues,

this evidence supports the inference that Mr. Tabbert was a cause of Howmedica's lost profits.

In reply, Mr. Tabbert points to declarations submitted by four of the six surgeons Mr. Knapton identified in his expert report. In each of these declarations, the doctors assert that Mr. Tabbert was not the cause of Mr. Tabbert's lost profits.

Although Mr. Tabbert's evidence could potentially convince a reasonable juror that he was not a cause of Howmedica's lost profits, that is not the standard here. As the party moving for summary judgment, Mr. Tabbert must show that the material facts are not in dispute. Howmedica has illustrated a temporal correlation between its decline in profits and Mr. Tabbert's new employment with RMMD. It has also provided evidence that could suggest Mr. Tabbert solicited the surgeons with which he formerly worked as a Howmedica employee. Accordingly, Howmedica has produced sufficient facts to resist Mr. Tabbert's motion for summary judgment.

## C. Mr. Tabbert has not met his burden to show that summary judgment is proper on his estoppel claim.

Finally, Mr. Tabbert moves for summary judgment on his claim that Howmedica should be estopped from enforcing any non-compete against him. As the proponent of this affirmative defense, Mr. Tabbert has the burden to establish "(1) an admission, statement or act inconsistent with a claim afterwards asserted,

(2) action by another in [reasonable] reliance upon that act, statement or admission, and (3) injury to the relying party from allowing the first party to contradict or repudiate the prior act, statement or admission." *Lybbert v. Grant Cty., State of Wash.*, 1 P.3d 1124, 1128 (Wash. 2000). Genuine issues of material fact exist regarding whether Howmedica made an inconsistent representation to Mr. Tabbert regarding its intent to enforce the 1995 Agreement and whether Mr. Tabbert reasonably relied on any representations. These issues of fact preclude summary judgment on this claim.

In support of his claim, Mr. Tabbert relies principally on an email, dated May 29, 2014, between Mr. Riggs and Ms. Lavey in which Mr. Riggs stated that he would not enforce Mr. Tabbert's non-compete. ECF No. 298-2 at 82. When questioned about this statement in his deposition, Mr. Riggs explained that his statement in the May 29, 2014 email to Ms. Lavey that Howmedica would not enforce Mr. Tabbert's non-compete was based on his initial misunderstanding that Mr. Tabbert had a paid non-compete. *Id.* Regardless of the meaning behind the statement, Mr. Tabbert cannot rely on this statement for the purposes of an estoppel argument, because he was not a party to the emails. Mr. Tabbert cannot reasonably rely on a statement of which he had no knowledge.

Mr. Tabbert also asserts that Mr. Riggs "let it be known" to the sales representatives at Howmedica that it was not his policy to enforce non-compete

agreements. ECF No. 191 at 14. However, even assuming this is true, Mr. Tabbert cannot establish that the undisputed facts show he detrimentally relied on this statement. Mr. Tabbert resigned from Howmedica in June of 2014. On July 16, 2014, Mr. Tabbert sent an email to attorney Richard W. Pitzner in which he stated "I learned yesterday afternoon through word of mouth that Stryker is using my 1995 document." ECF No. 298-1 at 131. This suggests that Mr. Tabbert knew as early as July of 2014 that Howmedica intended to enforce his non-compete agreement. Therefore, a genuine issue of fact exists as to whether Mr. Tabbert relied at all on any earlier statements made by Mr. Riggs and as to whether such reliance was reasonable under the circumstances.

Based on the information presented, Mr. Tabbert has not established that there is no dispute of material fact regarding whether Howmedica indicated to Mr. Tabbert that it would not enforce his non-compete agreement. Consequently, summary judgment on Mr. Tabbert's estoppel claim is not proper.

## CONCLUSION

Mr. Tabbert seeks early resolution of certain claims through summary judgment, however the remedy is not appropriate here. Accordingly, Mr. Tabbert's motion for summary judgment is denied.

For the foregoing reasons, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Third Renewed Motion for Summary & Declaratory Judgment, **ECF No. 191**, is **DENIED**.

**IT IS SO ORDERED.**  The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 24th day of October 2017.

_____
SALVADOR MENDOZA, JR.
United States District Judge